**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LEATRICE A. LUMPKIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12-cv-5889 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| COOK COUNTY PUBLIC DEFENDER, | ) | |
| MARY CAROL FARMAR, | ) | |
| MARY MALDONADO, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION & ORDER</u>**

Plaintiff Leatrice A. Lumpkin, proceeding pro se, sued defendants Cook County Public Defender, Mary Carol Farmar, and Mary Maldonado. Lumpkin's complaint alleges that the defendants discriminated against her based on her race and gender in violation of Title VII, 28 U.S.C. § 2000(e) *et seq.* and her age in violation of the Age Discrimination and Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* On June 18, 2013, the court dismissed Lumpkin's claims against Farmar and Maldonado. Now before the court are Lumpkin's oral request for recruitment of counsel and the Cook County Public Defender's ("Public Defender's Office") motion for summary judgment. For the reasons stated below, Lumpkin's oral request is denied, and the Public Defender's Office's motion is granted.

## I. LUMPKIN'S REQUEST FOR RECRUITMENT OF COUNSEL

On June 20, 2014, the court granted the motion by Lumpkin's appointed counsel, James E. Mahoney of Griffith & Jacobson, LLC, to withdraw. Lumpkin orally requested new counsel on that same day. The court took Lumpkin's oral request under advisement.

The court now declines to recruit counsel because doing so would be futile. *See Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999) (affirming lower court's denial of request for appoint of counsel, in part, because the plaintiff's "claims were of doubtful merit in any event"); *Zarnes v. Rhodes,* 64 F.3d 285, 288 (7th Cir. 1995) (The plaintiff "alleged indifference to her serious medical needs, but, as discussed below, that claim has no merit and does not warrant the appointment of counsel.").

As explained below, Lumpkin has failed to create a triable issue of fact on her claims. The court reached this conclusion after making a concerted effort to review not just the summary judgment record, but other materials as well, given Lumpkin's pro se status and the court's concern that necessary discovery was not taken. Specifically, while reviewing the documents that the Public Defender's Office submitted in support of their motion, the court discovered that appointed counsel did not depose Farmar or Maldonado, the individuals who decided to suspend and terminate plaintiff. Nor does it appear that appointed counsel requested the production of the personnel file of David Mann, the individual whom Lumpkin claims is similarly situated for the purpose of evaluating her claims. The court therefore took the unusual step of requesting the Public Defender's Office to submit Mann's personnel file under seal for the court to review. Ultimately, after reviewing the summary judgment record, Mann's personnel file, and the entirety of Lumpkin's deposition transcript, the court determined that appointing counsel would not make a difference because Lumpkin's claims lack merit.

## II.   THE PUBLIC DEFENDER'S OFFICE MOTION FOR SUMMARY JUDGMENT

### A.  LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56;

*Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012).

Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to judgment as a matter of law." *Cracco v. Vitran Express, Inc*., 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)). Under Local Rule 56.1(b)(3), the nonmoving party then must submit a "concise response" to each statement of fact, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." LR 56.1(b)(3)(C).

The Public Defender's Office moved for summary judgment and complied with the requirements of Local Rule 56.1(a). (*See* Def.'s Local Rule 56.1(a) Statement of Material Facts ("SOF"), ECF No. 86.) The Public Defender's Office also satisfied its obligation under Local Rule 56.2 to serve on Lumpkin the "Notice to Pro Se Litigants Opposing Summary Judgment." (*See* ECF No. 87.) Despite being served with this notice, Lumpkin failed to file a response to the Public Defender's Office's statement of material facts pursuant to Local Rule 56.1(b)(3).

Accordingly, the material facts contained in the Public Defender's Office's statement of facts are deemed admitted and undisputed for the purpose of the present motion.

## B. BACKGROUND

### i. Lumpkin's Employment with the Public Defender's Office

Lumpkin began working for the Public Defender's Office as a Stenographer III on December 16, 2002.[1] The Public Defender's Office provides legal representation to individuals who cannot afford an attorney in the areas of criminal defense, juvenile justice, child protection, appeals, post-conviction, and traffic cases.

As a Stenographer III, Lumpkin's professional duties included assisting attorneys, answering phones, typing subpoenas, filing, and other secretarial work. The expectations for the Stenographer III position are set forth in the Cook County "Standard Job Description" form. (*See* Maldonado Aff. Ex. 1.) The description provides that a Stenographer III is expected to have "[g]ood communication skills; [the] ability to convey information and explain or describe basic office policy and procedure to others in person or by telephone; [and the] ability to receive, understand and respond to routine inquiries and information offered by patrons, client, staff and visitors." (*Id.*)

During her employment with the Public Defender's Office, Lumpkin worked in several divisions under different supervisors. From 2002 to 2007, Lumpkin was assigned to the Multiple Defendant Division and reported to Gerald Odom. Lumpkin then was placed with the Professional Development Division, effective January 25, 2008, the First Municipal Division, effective May 11, 2009, and the Message Center, effective November 30, 2009; her supervisor for each of these assignments was Mary Maldonado, Support Staff Supervisor.[2]

---

[1] Lumpkin was born in September 1960.
[2] Maldonado was born in May 1959.

When Lumpkin was assigned to the Message Center, she had two primary responsibilities. One was answering the phone. Lumpkin fielded calls on the general public line, transferred calls, and took written messages. If Lumpkin took a message for an attorney, she had to deliver the message to the attorney's mailbox. Lumpkin's other core responsibility was distributing mail. During the time Lumpkin was assigned to the Message Center, she worked with a clerk named David Mann ("Mann"), who had the same duties she had.

During her employment, Lumpkin received annual cost-of-living salary increases, but she never received a merit-based raise or promotion.

### ii. Personnel Rules

All employees of the Public Defender's Office are subject to the Cook County Personnel Rules and Regulations ("Personnel Rules"). Personnel Rule 8.03 provides, in pertinent part:

(b)     Disciplinary action for major cause infractions need not be progressive. "Major cause" is defined as, but not limited to, the following behavior by an employee on duty or on the premises of any County facility:

3.     Fighting or disruptive behavior.
4.     Patient, employment or visitor abuse or harassment, including, but not limited to, racial and ethnic slurs.
7.     Gross insubordination.
9.     Negligence in performance of duties.

(c)     Other violations which will result in disciplinary action include, but are not limited to, the list specified below:

**NO EMPLOYEE SHALL DO ANY OF THE FOLLOWING WHILE ON DUTY OR WITHIN COUNTY FACILITIES:**

2.     Fail to follow instructions or proprietary information, including patient or personnel records, Hospital reports or tests, or any department files, documents, or data.
6.     Leave assigned place or area of work during working hours without permission of the supervisor.
12.     Sleeping or inattention to duty during working hours.

14.     Perform at less than a satisfactory level in any job classification.

### iii.  Lumpkin's Disciplinary Record

From November 2009 until her termination in June 2011, Lumpkin was counseled, reprimanded, and formally disciplined.  Lumpkin was first counseled on November 24, 2009, when Maldonado spoke to her regarding a loud altercation Lumpkin had had with a coworker. Maldonado subsequently counseled Lumpkin on February 10, 2010 for "unprofessional and disruptive conduct."  (Maldonado Aff. ¶ 10.)

On March 26, 2010, Maldonado again issued Lumpkin a verbal warning "for unprofessional/disruptive conduct" following an incident on March 25, 2010.  According to the Notice of Disciplinary Action Maldonado completed, Lumpkin engaged in a loud verbal altercation with a co-worker in the Message Center.  The notice informed Lumpkin that future incidents of unprofessional conduct would lead to further disciplinary action, including termination.

On April 23, 2010, Maldonado issued Lumpkin a written warning for her "poor/unprofessional work performance and inappropriate/disruptive conduct." (*See* Maldonado Aff. Ex. 4.)  The Notice of Disciplinary Action indicated that Lumpkin unnecessarily placed two office calls on hold on April 20, 2010, and when questioned about the incident, Lumpkin "became loud, angry, and disruptive in [the] work area." (*Id.*)  Maldonado advised Lumpkin that future violations of the Personnel Rules would lead to "Suspension/Termination." (*Id.*)

Maldonado evaluated Lumpkin for Fiscal Year 2009 on May 18, 2010. Lumpkin was evaluated in fourteen categories in the Performance Appraisal. Maldonado gave Lumpkin "unsatisfactory" in two categories: "communication skills" and "ability to work with others"

because of the problems she had communicating with her peers and supervisor. (SOF ¶ 18.) Maldonado advised Lumpkin that she needed to improve in these areas. The Performance Appraisal also indicates that Lumpkin was tardy thirteen times in the evaluation period. Lumpkin signed the Performance Appraisal on May 18, 2010.

On June 3, 2010, Maldonado recommended that Lumpkin receive a one-day suspension for an incident occurring on or around April 30, 2010. (*See* Maldonado Aff. Ex. 5.) A letter dated June 3, 2010 from Farmar, Legal Chief Counsel, states that Lumpkin was being disciplined "for [her] continued poor and unprofessional work performance relating to incidents which occurred on and around April 30, 2010."[3] (*Id.*) On that day, Lumpkin answered phones in the Message Center "improperly and unprofessionally and misinform[ed] another staff member of the Division Chief's whereabouts without checking time sheets." (*Id.*) Maldonado informed Lumpkin that future violations of the Personnel Rules would result in further discipline, including termination. Lumpkin served the suspension on June 4, 2010.

A series of incidents between June 8, 2010 and July 21, 2010 led Maldonado to recommend on August 31, 2010 that Lumpkin receive a ten-day suspension. A letter from Farmar dated August 31, 2010 stated that Lumpkin failed to follow work directives on June 8, 2010, June 22, 2010, July 1, 2010, July 2, 2010, July 14, 2010, July 20, 2010, and July 21, 2010, and engaged in "loud, argumentative, and unprofessional conduct" on July 1, 2010, July 14, 2010, and July 21, 2010. (Maldonado Aff. Ex. 5.) Lumpkin was suspended without pay for five days for "poor work performance" and an additional five days for "unprofessional conduct." (*Id.*) The corresponding Notice of Disciplinary Action notified Lumpkin that future violations of the Personnel Rules would lead to "[p]rogressive discipline, up to and including termination." (*Id.*)

---

[3] Farmar was born in September 1953.

Lumpkin was supposed to begin serving her ten-day suspension on September 1, 2010, but the union appealed the suspension at a disciplinary meeting on August 31, 2010. The union contended that Lumpkin's suspension should cover "additional infractions" that Lumpkin purportedly committed on August 17, 2010, August 20, 2010, and August 24, 2010. On these dates, Lumpkin failed to follow or complete work directives and engaged in "loud, argumentative, and unprofessional conduct," according to an August 31, 2010 letter from Farmar to Lumpkin. (*See* Maldonado Aff. Ex. 7.) After "[m]anagement deliberated," it accepted the union's proposal for the suspension to encompass Lumpkin's "additional infractions." (*Id.*) Lumpkin served her suspension on September 8, 9, 10, 13, 14, 15, 16, 17, 20, and 21 and returned to work on September 22, 2010. She was advised that future violations could lead to termination. Farmar "strongly recommended" that Lumpkin "seek the services of the Employee Assistance Program or the union sponsored [sic] Personal Support Program." (*Id.*)

On December 1, 2010, Maldonado recommended that Lumpkin be suspended thirty days for poor work performance and unprofessional conduct, which Maldonado detailed in a November 18, 2010 memorandum to Lumpkin. (*See* Maldonado Aff. Ex. 8.) The specific incidents Maldonado cited included "responding rudely and unprofessionally to callers" in the Message Center on October 28, 2010 and November 15, 2010 and arguing loudly with a coworker on October 29, 2010. (*Id.*) Consequently, Lumpkin was suspended for thirty days beginning on December 2, 2010. A letter from Farmar to Lumpkin dated December 1, 2010 informed Lumpkin that future violations of the Personnel Rules could "result in termination." (*Id.*) Farmar again recommended that Lumpkin "seek the services of the Employee Assistance Program or the union sponsored [sic] Personal Support Program."

On May 26, 2011, Maldonado recommended to Rhonda Berryhill ("Berryhill"), Deputy of Administrative Services, that Lumpkin be terminated because of her "numerous occurrences of poor work performance and unprofessional conduct," which Maldonado stated "ha[d] been long term issues." (Maldonado Aff. Ex. 9.) Maldonado then cited nineteen incidents that occurred after Lumpkin returned on January 13, 2011 from her thirty-day suspension. (*See* Maldonado Aff. Ex. 10.)

After an "investigatory meeting" on June 17, 2011 and a "pre-disciplinary meeting" on June 23, 2011, Farmar, with the concurrence of Berryhill, terminated Lumpkin at a "disciplinary meeting" on June 28, 2011. (*See Id*.) The Notice of Disciplinary Action, dated June 28, 2011, indicates that Lumpkin was terminated for "numerous incidents of proof work performance, insubordination, and harassment/inappropriate behavior" in the workplace. (*Id.*) A letter from Farmar, also dated June 28, 2011, cited Lumpkin's purported violations of the Personnel Rules that occurred between November 2009 and June 2011 as proof of Lumpkin's "continued failure to obey Cook County Rules and Regulations." (*Id.*)

### iv. Lumpkin's Charges of Discrimination and Complaint

On December 8, 2010, Lumpkin filed Charge of Discrimination No. 2011CA1643, in which she alleged race, age and sex discrimination for the suspensions she received on August 31, 2010 and December 1, 2010. Lumpkin claimed similarly situated employees who were male, not black, or below the age of forty were "accused of demonstrating poor work performance and unprofessional conduct in the workplace" but did not receive comparable suspensions. (Lumpkin Dep. Ex. 10.)

Lumpkin filed Charge of Discrimination No. 2012CA0024 on July 6, 2011. In this charge, Lumpkin claimed that the Public Defender's Office discriminated against her on the

basis of her age and gender, as shown by alleged harassment she experienced from February 22, 2011 through June 27, 2011 and by her termination of employment on June 28, 2011. Lumpkin also alleged that the Public Defender's Office retaliated against her for filing Charge No. 2011CA1643. Lumpkin cited alleged harassment that occurred between February 22, 2011 through June 27, 2011 and her termination on June 28, 2011 as alleged acts of retaliation. (Lumpkin Dep. Ex. 11.)

On July 26, 2012, Lumpkin filed the instant lawsuit, in which she alleged that she was suspended "for fifteen days and then thirty days, and subsequently discharged . . . because of her race, age, and sex" and "in retaliation" for filing a discrimination charge. (Compl. at 3.)

## C. ANALYSIS

### i. Discrimination Claims

To withstand a motion for summary judgment on her discrimination claims, Lumpkin must put forth evidence that she suffered an adverse employment action and that the action was the product of discrimination based on her race, gender, or age. It is undisputed that Lumpkin's termination on June 28, 2011 constitutes an adverse employment action.

There are two ways for a plaintiff to establish that an adverse employment action was the product of discrimination. Under the "direct method," a plaintiff must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue." *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 849 (7th Cir. 2010). The focus of the direct method of proof is whether the evidence offered "points directly" to a discriminatory reason for the employer's action. *Darchak v. City of Chi. Bd. Of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009).

Alternatively, under the "indirect method," the plaintiff must establish a prima facie case of discrimination. *See South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). After a plaintiff establishes this prima facie case, the burden shifts back to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 751. If the defendant can do so, the burden then shifts back to the plaintiff to present evidence showing that the defendant's purported reason for the adverse action was pretextual. *Id.* Lumpkin's claims fail under both the direct and indirect methods.

## 1. Direct Method

Proving discrimination by direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Lumpkin offers no evidence of derogatory remarks made against her for her age, gender, or race, much less admissions reflecting a prohibited animus.[4]

Absent evidence of an admission, a plaintiff may proceed under the direct method using "a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (quoting *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Courts typically identify three non-exclusive categories of circumstantial evidence on which a plaintiff may rely to make such a showing: (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the

---

[4] In her deposition, Lumpkin references a conversation between her and Maldonado, when Maldonado said that Lumpkin was "getting older." (Lumpkin Dep. 70:3-8.) This comment, however, is insufficient evidence of direct discrimination, as Lumpkin admits that she "took it as a joke" and noted that Maldonado is "as old as" Lumpkin. *Id.* (*Id.*)

protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Yong-Qian Sun v. Bd. of Trs.*, 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted).

Lumpkin points to no evidence in the record to suggest that she can prove discrimination under the direct method. Her response brief does not reference any statements or behavior that was directed at any individual in a protected group. The only individual Lumpkin identifies as being similarly situated to her is David Mann. Mann is an African-American male who is less then forty years of age. Lumpkin claims that the Public Defender's Office treated Mann more favorably than Lumpkin by not disciplining him, even though he also allegedly had performance issues.

Lumpkin's attempt to compare herself with Mann to establish her discrimination claims fails on several fronts. To begin with, the record belies the notion that Mann is similarly situated to Lumpkin. Two individuals are similarly situated if they are "directly comparable . . . in all material respects." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013). The "similarly situated" inquiry is meant to "eliminate other possible explanatory variables, such as differing roles, performance histories, or decisionmaking personnel, which helps isolate the critical independent variable — discriminatory animus." *Id*. (internal quotations omitted). An allegedly comparable employee does not have to be identically situated to the plaintiff. *Id*. Instead, the court "must conduct a common-sense examination" to determine if an employee is comparable. *Id*.

Although Lumpkin alleges that Mann is a similarly situated employee, her allegation does not survive summary judgment because there is no evidence that supports viewing Mann as

similarly situated. Lumpkin testified in her deposition that the Public Defender's Office treated Mann better than her "[b]ecause he was doing things and . . . not being warned about them . . . ." (Lumpkin Dep. 70:18-19.) Lumpkin continued, "I mean he would come back late" from lunch or a break and "mess up the mail. . . ." (*Id.* 70:18 -71:19.) But Lumpkin does not know whether Mann was ever disciplined or reprimanded. Nor does she cite to any specific instances when Mann violated the Personnel Rules.

In fact, contrary to Lumpkin's belief, Mann was reprimanded, except not as severely as Lumpkin because his Personnel Code violations were less serious.[5] The examples of misconduct that Lumpkin attributes to Mann demonstrate this point. Lumpkin claims that Mann was tardy and did not properly process the mail. Indeed, Mann received verbal reprimands, formal counseling, and written warnings for these performance problems. In December 2010, Mann was formally counseled for clerical errors he had been making on payroll sheets and for failing to meet deadlines. Maldonado then issued Mann a verbal reprimand in March 2011 for failing to sign in when arriving at work; leaving phones unattended; taking an unauthorized break; forgetting to relieve a coworker for her break; and leaving paperwork behind. Mann received an additional verbal reprimand in July 2011, this time for being tardy 29 times between January 1, 2011 and July 29, 2011. (*See* Def.'s Supp. Br. at 6, ECF No. 97.)

Lumpkin's Personnel Code violations, by contrast, have more to do with her behavior in the workplace than simple job performance defects. Specifically, Lumpkin was progressively disciplined for being rude to customers, arguing with coworkers, and engaging in other unprofessional conduct. Examples of cited misconduct include complaints by callers—on August

---

[5] On May 22, 2015, after the Public Defender's Office had moved for summary judgment, the court ordered the Public Defender's Office to produce "Mann's performance reviews and disciplinary records, including any related memoranda or notices of disciplinary action that might exist, from January 2008 through July 2011" under seal for the court's review. *See* ECF No. 96.

20, 2010, November 15, 2010, and May 5, 2011—who spoke with Lumpkin and subsequently contacted the Public Defender's Office to report that Lumpkin had been rude. There are also several instances of confrontations between Lumpkin and coworkers, including an incident on March 16, 2011, when Lumpkin was heard remarking to colleagues on the 15th floor, "Fuck them, they can kiss my ass," referring to other coworkers. (*See* Maldonado Aff. Ex. 10.) These examples underscore that an "explanatory variable"—here, the difference in quality and severity between Lumpkin's and Mann's underlying transgressions—renders Mann an inapt comparator. *See Perez*, 731 F.3d at 704.

In addition to Mann's significantly different disciplinary history, Lumpkin's claims also suffer from her inability to pinpoint any evidence of discrimination. Importantly, Lumpkin recognized as much in her deposition. Testifying regarding her claim for race discrimination, Lumpkin acknowledged that she has no "first-hand knowledge of" any information that shows she was discriminated against on account of her race. (*Id.* 72:14-73:15.) When Lumpkin was asked whether she could recall an instance when she felt discriminated against, she came up empty.

> Q.    And while you were working for the Public Defender's Office, did you ever make any complaints, either verbal or written, about any race discrimination that you felt you were experiencing?
> A.    I don't know. I don't know. I really don't.
> Q.    Is there anything that you can recall right now?
> A.    I could have said something to someone because Mary Maldonado and Mary Farmar were attacking me. They were harassing me and they were Caucasian women. So I could have said, you know, maybe it's because I'm black or maybe because I'm 50. I don't know. I could have said something, but I don't know. I don't know for sure.

(*Id.* 72:9-21.)

Lumpkin's allegations of gender discrimination similarly lack support. Lumpkin claims that she was suspended and terminated because of her gender, but she could not recall whether

"anyone ever ma[d]e any comments to [her] about [her] gender" that she "considered to be discriminatory." (Lumpkin Dep. 76:3-6.) The only basis for her allegations of gender discrimination is the alleged favoritism that Lumpkin's supervisors, Maldonado and Farmar, displayed to Mann. But the court has already found this allegation of "favoritism" both unfounded, in that Mann *was* reprimanded, and explainable by factors other than discriminatory animus—namely, Lumpkin's documented instances of unprofessionalism in the workplace. Moreover, Lumpkin alleges that Maldonado and Farmar favored Mann, but both of these supervisors are female. Under the law of this circuit, "[w]hile it certainly is possible for a female supervisor to discriminate against another female on the basis of her sex," a plaintiff must "provide[] circumstantial evidence that would make the theory plausible." *Brill v. Lante Corp.*, 119 F.3d 1266, 1272 (7th Cir. 1997). Here, there is no such evidence.

The Seventh Circuit takes a similar approach to an individual who alleges age discrimination against supervisors who are older than the employee making the allegation. *See Mills v. First Fed. S & L Ass'n*, 83 F.3d 833, 842 (7th Cir. 1996) (interpreting a comment a supervisor made to the plaintiff "concerning the difficulty older workers face when looking for re-employment" as lacking "discriminatory undertones," given that the supervisor was 55 years old and two years older than the plaintiff). In this case, the decisionmakers Lumpkin identifies, Maldonado and Farmar, are older than Lumpkin. Although this fact does not preclude the possibility of age discrimination, Lumpkin must point to some circumstantial evidence that suggests Maldonado or Farmar disciplined Lumpkin because of her age. Lumpkin's deposition testimony, however, indicates that she has no such evidence. Attempting to explain her grounds for believing she had suffered age discrimination, Lumpkin acknowledged that she was "speculating" that age was the cause for her suspension and termination. (Lumpkin Dep. 72:9-

21). *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("At the summary judgment stage . . . circumstantial evidence of discrimination must point directly to the conclusion that an employer was illegally motivated, without reliance on speculation.") (quotation marks and citation omitted).

## 2. Indirect Method

Under the indirect method, Lumpkin must prove four elements to establish a prima facie case of discrimination: (1) she is a member of a protected class; (2) her performance met the employer's legitimate expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside of the protected class more favorably. *See Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2001); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (noting that the second and fourth prongs of this test "merge" when the allegations relate to a disparate punishment).

The Public Defender's Office does not dispute that Lumpkin fulfills the first and third elements of the test. She is a member of a protected class based on her race, gender, and age. *See Vega v. Chi. Park Dist.*, 958 F. Supp. 2d 943, 951 (N.D. Ill. 2013) ("Here, [Plaintiff] has satisfied the first and third elements of the test by pleading that she is a member of a protected class (Hispanic) and that her employment termination constitutes the termination . . . of the contractual relationship.") (internal quotation marks omitted)); 29 U.S.C § 631 (protecting "individuals who are at least 40 years of age"). Moreover, Lumpkin's termination constitutes an adverse employment action. *See Vega*, 958 F. Supp. 2d at 951.

Lumpkin, however, cannot establish that a similarly situated employee outside of the protected classes was treated more favorably. As previously explained, the only individual she identifies as being similarly situated to her is Mann, but her employment performance is

materially distinguishable from his.  To establish her prima facie case of discrimination,

Lumpkin must show that she is "similarly situated with respect to performance, qualifications,

and conduct [with another employee]. This normally entails a showing that the two employees

dealt with the same supervisor, were subject to the same standards, and had engaged in similar

conduct without such differentiating or mitigating circumstances as would distinguish their

conduct or the employer's treatment of them." *Radue*, 219 F.3d at 617-18 (internal citations

omitted).

 Although Lumpkin testified that she and Mann have the same supervisors, Maldonado

and Farmar, and were subject to the same standards, she has not submitted evidence showing that

Mann engaged in the same conduct she did.  There is no evidence that Mann was involved in a

comparable number or type of workplace incidents.  Nor has Lumpkin showed that Mann

received more favorable treatment for his performance issues, as he too received formal

counseling and reprimands, although the discipline was less severe given the less severe issues

with his performance.  Accordingly, Lumpkin fails to make a prima facie case for discrimination

under the indirect method and cannot prevail on her claim.[6]

 Even if Lumpkin could make a prima facie case for discrimination, the Public Defender's

Office still would be entitled to summary judgment. Once a plaintiff makes a prima facie

---

[6] Lumpkin argues in her response brief that the Public Defender's Office did not produce the "comparative information" she needs to establish her claim, but Lumpkin was appointed counsel, James E. Mahoney of Griffith & Jacobson, LLC, who represented Lumpkin in discovery. Mahoney moved to withdraw in June 2014 and represented in his motion that he assisted in the "review and analysis of documents produced by defendant."[6] *See* ECF No. 76.  If Lumpkin believed that documents were missing from the Public Defender's Office's production, she should have informed her counsel or the court before the Public Defender's Office moved for summary judgment.  At this point, the court still does not know what documents Lumpkin is alleging the Public Defender's Office failed to provide.  Lumpkin neither specifies the documents she believes the Public Defender's Office should have produced nor explains how those documents could have supported her claim.  Regardless, the court ordered the Public Defender's Office to submit Mann's personnel file and took it into account in reviewing the record.

showing, the burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for her termination. Here, the Public Defender's Office contends that it suspended and terminated Lumpkin for her "numerous well-documented incidents of poor work performance, insubordination, harassment, and inappropriate behavior." (Def.'s Br. at 13, ECF No. 85.) This explanation shifts the burden back to Lumpkin to show that the Public Defender's Office's reasons for suspending and terminating her were pretextual.

"The focus of the pretext inquiry is whether the proffered reason is a lie." *Smiley v. Columbia Coll. Chi*., 714 F.3d 998, 1002-03 (7th Cir. 2013). "An inquiry into pretext requires that we evaluate the honesty of the employer's explanation, rather than its validity or reasonableness." *Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013). For a plaintiff to establish pretext, she "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendant's] proffered reasons that a reasonable person could find them unworthy of credence and hence infer that [the defendant] did not act for the asserted non-discriminatory reasons." *Bouhmedi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Lumpkin has identified no such weakness, implausibility, inconsistency, or contradiction. She does not address the Public Defender's Office's grounds for terminating her in her response brief, and nothing in her deposition testimony provides a basis to infer pretext.

In sum, Lumpkin cannot establish a prima facie case of discrimination under the indirect method. She has failed to demonstrate that any similarly situated employee outside the protected classes was treated differently from her. The Public Defender's Office offers legitimate, non-discriminatory reasons for her discharge. And Lumpkin has not showed that the proffered reasons are pretextual. Accordingly, the Public Defender's Office is entitled to summary judgment on Lumpkin's discrimination claims.

### ii. Retaliation Claim

"Title VII makes it unlawful for an employer to discharge or otherwise discriminate against an employee because that employee has 'made a charge' under Title VII." *Juarez v. Ameritech Mobile Communications, Inc*., 957 F.2d 317, 321 (7th Cir. 1992) (citing 42 U.S.C. § 2000e-3(a)). "To establish a prima facie case of retaliation, the plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse action by her employer; and (3) that [sic] there is a causal link between the protected expression and the adverse action." *Id.* at 702 (quoting *Jennings v. Tinley Park Community Consolidated District No.* 146, 796 F.2d 962, 966-67 (7th Cir. 1986)).

The only element in dispute is causation. Lumpkin alleges that the Public Defender's Office terminated her on June 28, 2011 in retaliation for her filing a discrimination charge on December 8, 2010.  Lumpkin predicates her claim on the assumption that an employer cannot take an adverse action against an employee, once that employee files a charge of discrimination against the employer and the charge remains pending.  Lumpkin explained her theory of liability in her deposition:

> Q.   [H]ow did [Farmar and Maldonado] retaliate against you?
> A.   During one of the fact-finding conferences during the questioning -- Well, first of all, I was in the protected activity and it was asked if they were aware -- or Farmar was asked was she aware, and she said yes.  But she inferred she did what it was that she wanted to do, and that was fire me. She didn't care about my -- me being protected.
> Q.   And what was the protected activity?
> A.   That I had filed a charge with the Department of Human Rights so I was protected until it was supposed to be cleared.

(Lumpkin Dep. 76:20-77:7.)

Lumpkin essentially contends that the mere fact that she was terminated after she filed her charge of discrimination shows a causal connection between the two events.  But filing a

charge of discrimination does not protect an employee from warranted discipline. Lumpkin is mistaken if she believes the Public Defender's Office was barred from disciplining her, regardless of her conduct, while her charge was pending. Moreover, temporal proximity between the protected activity and the adverse action, standing alone, is insufficient. *See Jajeh v. County of Cook*, 678 F.3d 560, 570 (7th Cir. 2012) (awarding summary judgment to employer because the five-month gap between the employee's filing a discrimination complaint and the adverse action was not suspicious timing). In this case, more than six months elapsed between Lumpkin's filing of her charge and her termination, and during that period, the Public Defender's Office recorded Lumpkin's involvement in nineteen workplace incidents from February 22, 2011 to June 10, 2011. (*See* Maldonado Aff. Ex. 10.) Maldonado detailed the incidents in an internal memorandum, dated May 19, 2011, which Farmar relied upon in making the decision to terminate Lumpkin. (*See* Farmar Aff. ¶ 9.) Lumpkin has not addressed these incidents or the fact that Farmar cited the incidents as grounds for Lumpkin's termination. Thus, although the Public Defender's Office fired Lumpkin after she filed her first charge of discrimination, Lumpkin offers no facts to establish a connection between the two events.

Lumpkin must do more than rest on her allegation that her termination was retaliation for her filing a charge of discrimination. Because Lumpkin has failed to establish a triable question of fact regarding the Public Defender's Office's motivation for firing her, the Public Defender's Office's motion for summary judgment as to Lumpkin's retaliation claim is granted.

### D. CONCLUSION

For the reasons stated above, the Public Defender's Office's motion for summary judgment is granted. The clerk is directed to enter judgment in favor of the Public Defender's Office and against Leatrice A. Lumpkin. The case is terminated.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   June 4, 2015